TROUTMAN SANDERS LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Lee W. Stremba, Esq.
Brett Goodman, Esq.
Telephone: (212) 704-6000

*Proposed Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| WATERSCAPE RESORT LLC | ) Case No. 11-_____(___) |
| | ) |
| Debtor. | ) |
| | ) |

**LOCAL RULE 1007-2 DECLARATION**
**IN SUPPORT OF FIRST-DAY PLEADINGS[1]**

I, Ezak Assa, declare as follows:

1.      I am the Executive Vice President of debtor Waterscape Resorts LLC ("**Waterscape**" or the "**Debtor**"), the owner and, with certain affiliates, the developer of a condominium hotel and residential apartment building located at 66-70 West 45th Street, New York, New York (the "**Property**").

2.      I am generally familiar with the Debtor's day-to-day operations, business affairs, and books and records, as well as the Debtor's restructuring efforts. I submit this declaration (this "**Declaration**") in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") to assist this Court and parties in interest in understanding the circumstances that compelled the commencement of this Chapter 11 case (the "**Chapter 11 Case**") and in support of: (a) the Debtor's petition for relief under

chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); and (b) the emergency relief that the Debtors have requested, or will shortly request, from the Court pursuant to the motions and applications described herein, including the Debtor's proposed use of its secured lenders' cash collateral (collectively, the "**First Day Pleadings**").

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management team and the Debtor's advisors, my review of relevant documents and information concerning the Debtor's operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I would testify to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

4.      To assist the Court in becoming familiar with the Debtor and the initial relief sought by the Debtor to stabilize operations and facilitate its restructuring, This Declaration is organized into three (3) sections.  Section I provides background information with respect to the Debtor's corporate history and its business operations, the circumstances leading to the commencement of the Chapter 11 Case, and as well as a summary of the Debtor's prepetition capital and debt structure.  Section II summarizes the relief requested in the First Day Pleadings. Section III provides an overview of the exhibits attached hereto that set forth certain additional information about the Debtor, as required by Local Bankruptcy Rule 1007-2.

## I.      <u>GENERAL BACKGROUND</u>

**(a)      Company Business and Circumstances Leading to the Debtor's Filing under Chapter 11**

5.      Waterscape is a Delaware limited liability company formed on or about January 24, 2005.  The operations of the Debtor are governed by that certain Amended and Restated

Limited Liability Company Agreement of Waterscape Resort LLC, dated as of July 19, 2005. The principal office of the Debtor is at 15 West 34th Street, New York, New York 10001.

6.      On or about July 19, 2005, Waterscape acquired the Property, consisting of the three contiguous buildings at 66, 68 and 70 West 45th Street in Manhattan, for the sum of $20,000,000, to develop the Property into a forty-five (45) story condominium project including a luxury hotel, a world-class restaurant and luxury residential apartments.  The purchase was financed with a $17,000,000 acquisition loan and mortgage from U.S. Bank Association ("**US Bank**").

7.      Construction of the hotel and residential units, given the name "Cassa NY Hotel and Residences," commenced in July 2007.  By the end of September, 2010, the hotel and residential units were completed. The Debtor generates its revenue from guests who stay at the hotel and in the Debtor's residential condominium units, and from sales of unsold residential condominium units.  The Debtor's hotel and rental business has produced gross revenues of approximately $17,000,000 to $18,000,000 on an annual basis, and by the end of September 2010, the Debtor had sold five (5) residential apartment units for a total of approximately $12,710,340.

8.      The Debtor's restaurant is not yet open for business.  However, the restaurant is in the final stages of planning, with construction expected to take approximately five or six months.  When the restaurant opens, Waterscape expects that a very prominent and successful chef will be at the helm and the restaurant will add significantly to the profitability of the project. Until the restaurant is completed, breakfast and room service is provided to guests from kitchen facilities on the tenth (10th) floor of the building.

9.     Sited within a prime location on 45th Street in Midtown Manhattan, near the bustle of Times Square, world class shopping experiences of Fifth and Madison Avenues, and New York's theater district, the Cassa NY Hotel and Residences features 165 elegantly designed hotel rooms, and above the hotel units, fifty-seven (57) residences.  The restaurant will occupy the first level below ground, but will be visible from the ground floor hotel lobby.  The kitchen for the restaurant will occupy the second level below ground, and a third level below ground is used for offices.

10.     The apartments are available for sale or to rent and are fully furnished and equipped.  Residents in the hotel and in the residential units enjoy the services of a 24 hour concierge staff and the a la carte amenities of a luxury boutique hotel, including housekeeping, internet, telephone and cable.  Given the quality of the project, the amenities offered to residents and a prime location for tourism and business alike, the Cassa NY Hotel and Residences are highly valuable properties.

11.     While the national and global economic crisis, as well as economic factors local to New York City, has affected the hospitality industry and the market for residential apartments, and thus the Debtor's business and overall revenue, the Debtor's operations remain strong and significant opportunities remain for the business in the future.  The Property has recently been appraised by KTR Real Estate Advisors LLC ("**KTR**"), a firm of New York Certified General Real Estate Appraisers.  In its appraisal, dated November 19, 2010, KTR opines that the hotel component of the Property has a market value of $128,000,000 and the residential condominium component of the Property has a gross sellout market value of $86,000,000.

12.     Unfortunately, the Debtor has for several months been embroiled in litigation with numerous contractors and subcontractors who have asserted alleged mechanics lien claims

against the Property totaling approximately $20,000,000. Almost half of the total amount of mechanics lien claims asserted against the Debtor's property have been filed by the Debtor's former Construction Manager, Pavarini McGovern LLC ("**Pavarini**") and the other half of the total is comprised of subcontractor claims which are duplicative or redundant of the Pavarini claims. On or about June 28, 2007, Pavarini and Waterscape entered into a contract for the construction of the hotel and residential condominium units (the "**Construction Management Agreement**"). Over the three plus years that the project was under construction, many disputes arose between Pavarini and Waterscape and were submitted to a Dispute Resolution Board ("**DRB**") that was created pursuant to the CMA.[1] Other disputes are under litigation in court proceedings.

13. During the course of the project, Pavarini missed every deadline or "Milestone Date." Waterscape gave Pavarini over some twenty (20) notices of default dating as far back as May, 2009 which were not cured, including numerous notices regarding defective, nonconforming and incomplete work, and sometimes dangerous conditions caused by Pavarini. Among other things, Waterscape contends that Pavarini falsely billed and collected from Waterscape some $200,000 over a two year period for insurance premiums for SubGuard Insurance for a trade contractor without ever having procured such insurance. On or about September 27, 2011, Waterscape terminated Pavarini's contract as a result of Pavarini's many uncured defaults. Waterscape contends that because of Pavarini's many defaults, and the damages caused thereby, Waterscape is owed substantially more from Pavarini than Pavarini

---

[1] Since the commencement of construction, there have been and continues to be over some 38 submissions before the DRB. Each submission contains several disputes. Further, there are also reconsideration and additional matters. Pavarini and Waterscape have commenced several actions in court regarding their disputes before the DRB. The most important dispute is determining if the DRB still has authority to resolve the disputes or may the parties litigate them in court.

claims is due from Waterscape. Unfortunately, while Waterscape and Pavarini litigate, Pavarini's mechanics liens remain of record.

14. Because the Debtor has not had sufficient resources to bond the mechanics liens of Pavarini and other contractors while the parties litigate the underlying claims and counterclaims, the Debtor has not been able to close on pending contracts for the sale of residential apartment units. This impediment has prevented the Debtor from generating revenues which would have been used to pay its debt service obligations to the Secured Senders. As a result, Waterscape has defaulted on a principal payment obligation under its secured loan agreements, as described below, and has been forced to address that default, and other non-payment defaults, by seeking bankruptcy relief in this Chapter 11 Case.

**(b)  The Secured Lender's Foreclosure Action and the Debtor's Chapter 11 Filing**

15. As of the Petition Date, the Debtor had outstanding approximately $134,400,000 of secured loan principal obligations under credit facilities with US Bank and USB Capital Resources, Inc. ("**USB**, and together with US Bank, the "**Secured Lenders**"). The aforementioned debt is secured by liens upon all of the assets of the Debtor, including mortgages on the Debtor's real property, together with liens on all rents, proceeds and cash of the Debtor, pledges of member interests in Waterscape, and guarantees by Waterscape members and other third-party grantors. The Debtor's secured debt was incurred under three separate agreements for: (i) an acquisition and project loan; (ii) a construction loan; and (iii) a mezzanine loan; each of which was made in connection with the acquisition or development of the Debtor's property.

16. Over the last several months, the Debtor engaged in extensive negotiations with the Secured Lenders regarding the parameters of a comprehensive restructuring. At the same time, as detailed below, the Debtor engaged in extensive marketing efforts and negotiations to

sell its hotel assets to a non-insider buyer. Unfortunately, the restructuring discussions between the Debtor and the Secured Lenders reached an impasse, and on March 21, 2011, UBS, the junior of the two Secured Lenders, filed a foreclosure action against the Debtor in the Supreme Court of the State of New York, County of New York.[2] On March April 5, 2011, the Debtor filed this Chapter 11 Case in order to invoke the automatic stay arising under Section 362 of the Bankruptcy Code to stay the Secured Lenders' foreclosure action, and to seek protection under the bankruptcy laws while the Debtor reorganizes its business.

      **(c)**      **Contract to Sell the Debtor's Hotel Assets**

17.      For several months, the Debtor explored possible opportunities to sell its hotel assets as a means of retiring all or substantially all of the mortgage debt currently owed to its Secured Lenders, thereby leaving Waterscape with a largely unencumbered inventory of luxury residential apartments to sell. In recent weeks, the Debtor's efforts focused upon negotiations for a sale of the hotel to 70 West 45th Street Holding LLC (the "**Buyer**"), a company with no relationship to Waterscape. Those efforts were rewarded when, on or about March 11, 2010, the Buyer executed a contract (the "**March 11 Agreement**") to purchase the Debtor's hotel assets for the sum of $126,000,000 (plus a payment of approximately $2,000,000 relating to certain mortgage tax savings that the Buyer would realize on the transaction). The sale price to which the Buyer committed is consistent with, and strongly corroborates, the appraised value for the hotel as determined by KTR.

18.      Prior to the Debtor's filing of this Chapter 11 Case, the Debtor advised the Buyer that the Debtor would likely have to file a bankruptcy case in order to address both its obligations to the Secured Lenders and its numerous mechanics liens disputes. The Buyer in turn

---

[2] The action is entitled <u>UBS Capital Resources,Inc. f/k/a USB Capital Funding Corp</u> v. <u>Waterscape Resort LLC, et al</u>., Index No. 11810101.

advised the Debtor and the Secured Lenders that the Buyer would terminate the contract if the Debtor filed a bankruptcy case. In an attempt to avoid a loss of the March 11 Agreement, the Debtor proposed to the Buyer that the Debtor seek approval of the March 11 Agreement pursuant to a Plan of Reorganization to be filed as soon as practicable after commencing a bankruptcy case, so that the March 11 Agreement could proceed to a closing with little if any delay or disruption of the Debtor's hotel business. After extensive negotiations between the Debtor and the Buyer, and extensive discussions with the Secured Lenders to keep them apprised of the developing situation, the Buyer and the Debtor reached agreement on the terms of a new contract for a sale of the Debtor's hotel assets, and that agreement was memorialized in that certain Agreement of Purchase and Sale of Membership Interests by and between the Debtor and the Buyer, dated as of April 1, 2011 (the "**Hotel Sale Contract**").

19. Under the Hotel Sale Contract, the purchase price to be paid for the Debtor's hotel assets remains $126,000,000 (plus the payment of approximately $2,000,000 relating to certain mortgage tax savings that the Buyer would realize on the transaction). The deposit to be paid by the Buyer in the sum of $12,600,000 also remains the same as under the March 11 Agreement. The deposit was already paid in connection with the March 11 Agreement and thus no additional deposit was required. The Hotel Sale Contact does alter the mechanics of the closing. Under the March 11 agreement, the Buyer was to acquire the Debtor's hotel assets directly from the Debtor, whereas, under the Hotel Sale Contract, the Debtor will first contribute its hotel assets to a newly formed limited liability company subsidiary ("**Waterscape II**") and then, virtually simultaneously, the Buyer will acquire one hundred percent (100%) of the membership interests in Waterscape II.

20.     In addition, the Hotel Sale Contract includes provisions that specifically address the Debtor's then impending Chapter 11 filing.  Thus, pursuant to the Hotel Sale Contract, the parties will seek to have the contract approved and closed pursuant to a plan of reorganization without an auction process.   If the Bankruptcy Court does not enter an order approving the sale by on or before May 30, 2011, then the Debtor is required to return one half of the previously paid deposit, leaving a deposit of $6,300,000 with the Debtor.  In addition, should an auction process be ordered, the Buyer would be entitled to certain "Stalking Horse Protections" including a Break-Up Fee equal to three percent (3%) of the agreed sale price, plus a reimbursement of expenses, in the event that the Debtor were to sell its assets to a different buyer; and the Buyer's deposit shall be reduced to $2,600,000 and the balance returned to the Buyer.  Also, the Hotel Sale Contract provides that the Buyer shall have the right to terminate the contract if the Bankruptcy Court has not approved the contract within the earlier of July 29, 2011 or the date that is one hundred twenty (120) days after the Petition Date.  Finally, the Hotel Sale Contract provides that, irrespective of whether an auction process is ordered, the Debtor will reimburse the Buyer for its costs and expenses directly relating to the Chapter 11 Case.

21.     The Debtor believes that the filing of its Chapter 11 Case was the only viable alternative to preserve and maximize the value of the Debtor's business, for the benefit of all creditors and equity holders of the Debtor, in light of the commencement of USB's foreclosure action.  The Debtor also believes that the Hotel Sale Contract is highly beneficial to the Debtor's estate and to all of the Debtor's creditors and equity holders and will facilitate the Debtor's expeditious reorganization and exit from Chapter 11.  In that regard, the closing of the Hotel Sale Contract and payment of the net proceeds of the sale to the Secured Lenders will substantially reduce the Debtor's outstanding obligations to the Secured Lenders and leave the Debtor's

inventory of unsold residential condominium units (having an appraised value of approximately $86,000,000, as set forth above) largely unencumbered by the Secured Lenders' liens. The Debtor can then use the revenues of its condominium sales business, or obtain new financing using its portfolio of residential condominium units as collateral, to fund its obligations under the Plan. The Debtor believes that its assets are sufficiently valuable to permit the Debtor to confirm the Plan, under which the claims of the mechanics lien holders and all unsecured creditors, as may hereafter be allowed, will be paid in full and substantial value will be retained for the Debtor's equity holders.

**(d)       The Debtor's Corporate History and Organizational Structure**

22.       Waterscape was formed as a limited liability company on January 24, 2005 by filing a Certificate of Formation of Waterscape Resort LLC with the office of the Secretary of State of the State of Delaware. As set forth in the Amended and Restated Limited Liability Company Agreement of Waterscape Resort LLC, dated as of July 19, 2005 (the "**LLC Agreement**") the purpose of Waterscape, among other things, is to acquire, own, develop, construct, operate, manage, lease, finance, refinance, mortgage, sell, exchange or otherwise dispose of the Property (as a whole or as condominium units).

23.       The members and their percentage voting interests in the Debtor are as follows:

| Member Name | Percentage Voting Interest |
|---|---|
| **CLASS A MEMBERS (voting)** | |
| 45 INMEX, Corp. | 30.61% |
| **CLASS B MEMBERS (voting)** | |
| CATMEX 45, Corporation | 34.01% |
| Gemstone 45 LLC | 34.02% |

| Member Name | Percentage Voting Interest |
|---|---|
| Murray Friedman | 1.36% |
| **CLASS C MEMBERS (non-voting)** | |
| DEVELOPMEX 45, Corp. | 0% |
| Gemstone 45 LLC | 0% |
| Itzhak Precel | 0% |
| Murray Friedman | 0% |

24. The business, affairs and management of Waterscape, including its policies and administration, are vested with Salim Assa in his capacity as Manager. Pursuant to the LLC Agreement, as Manager of Waterscape, Salim Assa has the sole power and authority to take any and all action necessary or convenient to further the purposes of Waterscape, without consent of any of the members, including, inter alia, causing Waterscape to incur any indebtedness, filing bankruptcy on behalf of Waterscape and/or any entity in which Waterscape owns an interest, and determining capital needs for the Property such as admitting additional or substituted members and seeking additional capital contributions from existing members.

25. Watergate does not directly employ any individuals. Rather, Waterscape contracts with other companies to provide management and related services necessary to operate its hotel/residential operations and ongoing construction matters, and those companies employ the individuals necessary to provide those services. The operations of Waterscape's hotel and rental business are conducted through Assa Hospitality Management LLC ("**Assa Hospitality**"), a non-debtor affiliate of Waterscape. Assa Hospitality currently employs approximately forty-six (46) individuals in connection with the operations of the hotel and rental business.

Waterscape has a written contract with Assa Hospitality that expires on August 14, 2015 unless terminated earlier upon thirty (30) days notice for good cause shown. Assa Hospitality is reimbursed for its payroll expenses incurred on behalf of Waterscape and receives in addition a fee in an amount equal to three percent (3%) of the gross revenues of Waterscape's hotel, apartment rental business and food service businesses (not its condominium sales business).

26. In addition, Waterscape has a contract with The Associated Corporation ("**Associated**"), an entity that is not an affiliate of Waterscape, for housekeeping and security staffing for the hotel and rental units. There are currently approximately thirty-four (34) individuals, all employees of Associated, on the housekeeping and security staffs for the hotel and rental units. Waterscape has a written contract with Associated that expires on August 15, 2011, but said contract is essentially an at-will agreement it that it may be terminated by either party for any reason on (30) days notice. Associated is reimbursed for its payroll expenses incurred on behalf of Waterscape and receives in addition a fee in an amount equal to twenty percent (20%) of the payroll expenses incurred by Associated in connection with the services rendered to Waterscape.

27. In addition, although the restaurant is not yet open for business, Waterscape does provide food services to its hotel guests and apartment renters from kitchen facilities in the building. Waterscape employs the services of a professional food services firm, 1945 Restaurant LLC ("**1945 Restaurant**"), an entity that is not an affiliate of Waterscape, to provide those food services. 1945 Restaurant currently employs nine (9) individuals for that purpose. Waterscape has a written contact with 1945 Restaurant that expires on August 15, 2011, but it is essentially at-will agreement in that it may be terminated by either party for any reason on (30) days notice. Under its contract, 1945 Restaurant is to receive all of the revenues from the food services that it

provides, and should those revenues be insufficient to cover its expenses for providing those services, Waterscape is obligated to pay the deficit.

28.     Finally, Waterscape contracts for various executive administration, management, accounting, technical and secretarial services with SI Partners LLC ("**SI Partners**"), an affiliate of Waterscape. SI Partners currently has four individuals on its payroll who provide services of that type to Waterscape. Waterscape has a written contract with SI Partners that expires on December 31, 2012, but this contract is also essentially an at-will agreement in that each of the contracts may be terminated by either party for any reason upon ten (10) days notice. The contract with SI Partners provides that Waterscape will pay to SI Partners an amount equal to the actual compensation paid by SI Partners to its employees for services that the employees render to Waterscape, without any additional fee.

### (e)     Prepetition Debt Structure[3]

#### *The US Bank Acquisition and Project Loan*

29.     On June 17, 2007, US Bank loaned Waterscape the maximum principal amount of $40,501,792.00 under a certain Amended and Restated Acquisition and Project Loan Agreement, which was amended by that certain First Amendment and Reaffirmation Agreement, dated as of May 11, 2010 (as amended, the "**Acquisition and Project Loan Agreement**"). The acquisition loan in the principal loan amount of $31,321,306.00 (the "**Acquisition Loan**") is evidenced by that certain Consolidated, Amended and Restated Promissory Note (Acquisition Loan A), dated June 11, 2007 (as amended from time-to-time, the "**Acquisition Loan Note**") which Acquisition Loan Note is secured by, among other instruments, a certain Consolidated, Amended and

---

[3]     The descriptions of the Debtor's Prepetition Facilities and the collateral securing those facilities provided herein does not constitute, and should not be construed as, an admission by the Debtor regarding the validity, priority, enforceability, perfection, or amount of any obligation, claim, guarantee, lien, mortgage, pledge, or other security interest, or any other fact with respect thereto, and the Debtor reserves all rights to challenge or dispute any of the foregoing on any basis whatsoever.

Restated Acquisition Loan Mortgage, Assignment of Rents and Security Agreement, dated June 11, 2007, recorded on July 3, 2007 with the Office of the City Register for the City of New York (the "**Register**") as CRFN No. 2007000341298, and amended by that First Amendment to Consolidated, Amended and Restated Acquisition Loan Mortgage, Assignment of Rents and Security Agreement dated as of May 11, 2010 (as amended, the "**Acquisition Loan Mortgage**")**.**

30.     The project loan in the principal loan amount of $9,180,486.00 (the "**Project Loan**") is evidenced by that certain Promissory Note (Project Loan), dated June 11, 2007 (as amended from time-to-time, the "**Project Loan Note**") which Project Loan Note is secured by, among other instruments, a certain Project Loan Mortgage, Assignment of Rents and Security Agreement, dated June 11, 2007 and recorded on July 3, 2007 with the Register as CRFN No. 2007000341302, which was amended by that First Amendment to Project Loan Mortgage, Assignment of Rents and Security Agreement dated as of May 11, 2010 (as amended, the "**Project Loan Mortgage**").

31.     Certain obligations of Waterscape with respect to the Acquisition Loan and Project Loan have been guaranteed by Elias Hanono, Jacobo Hanono, Simon Masri, Salomon Masri, Ezra Tawil, Ezak Assa and me (each a "**Guarantor**" and collectively, the "**Guarantors**") pursuant to that certain (i) Agreement of Guaranty and Suretyship (Completion) (the "**Completion Guaranty**") and (ii) Agreement of the Guaranty and Suretyship (Payment) (the "**Payment Guaranty**", and together with the Completion Guaranty, the "**Guarantees**"), each dated as of June 11, 2007.

32.     Proceeds from the sale of multiple condominium units in the Property have been used to pay back the entire principal and interest due on the Project Loan.  The Acquisition Loan remains outstanding.  As of March 1, 2011, the Debtor's outstanding indebtedness under the

Acquisition and Project Loan Agreement amounted to approximately $31,321,300 in unpaid principal.

### The US Bank Construction Loan

33.     On June 17, 2007, US Bank loaned Waterscape the maximum principal amount of $100,112,566.00 (the "**Construction Loan**", and together with the Acquisition Loan and the Project Loan, collectively, the "**Senior Loan**") under a certain Amended and Restated Construction Loan Agreement, which was amended by that certain First Amendment to Amended and Restated Construction Loan Agreement and Reaffirmation Agreement, dated as of May 11, 2010 (as amended, the "**Construction Loan Agreement**").  The Construction Loan is evidenced by that certain Consolidated, Amended and Restated Promissory Note, dated June 11, 2007 (as amended from time-to-time, the "**Construction Loan Note**") which Construction Loan Note is secured by, among other instruments, a Consolidated, Amended and Restated Building Loan Mortgage, Assignment of Rents and Security Agreement, dated June 11, 2007 and recorded on July 3, 2007 with the Register as CRFN No. 2007000341301, which was amended by that Consolidated, Amended and Restated Building Loan Mortgage, Assignment of Rents and Security Agreement dated as of May 11, 2010 (as amended, the "**Construction Mortgage**").

34.     Pursuant to the Guarantees, the Guarantors have guaranteed certain obligations of Waterscape with respect to the Construction Loan.

35.     As of March 1, 2011, the Debtor's outstanding indebtedness under the Construction Loan Agreement amounted to approximately $95,108,000 in unpaid principal.

### The USB Mezzanine Loan

36.     On June 17, 2007, USB Capital Funding Corp., as the predecessor in interest to USB, loaned Waterscape the maximum principal amount of $8,653,589.00 (the "**Mezzanine**

**Loan**") under a certain Mezzanine Loan Agreement, which was amended by that certain First Amendment and Reaffirmation Agreement, dated as of May 11, 2010 (as amended, the "**Mezzanine Loan Agreement**"), by and among Waterscape, the Guarantors and USB. The Mezzanine Loan is evidenced by that certain Consolidated, Amended and Restated Promissory Note (Acquisition Loan B), dated June 11, 2007 (the "**Mezzanine Loan Note**") which Mezzanine Loan Note is secured by, among other instruments, a Consolidated, Amended and Restated Acquisition Loan Mortgage, Assignment of Rents and Security Agreement (Acquisition Loan B), dated June 11, 2007 and recorded on July 3, 2007 with the Register as CRFN No. 2007000341307, which was amended by that First Amendment and Reaffirmation Agreement dated as of May 11, 2010 (as amended, the "**Mezzanine Mortgage**").

37.     In connection with the Mezzanine Loan, 45 INMEX, Corp., CATMEX 45 Corp., Gemstone 45 LLC, DEVELOPMEX 45 Corp., Murray Friedman and Itzhak Precel (the "**Pledgors**") pledged their members interests in Waterscape to USB pursuant to a certain Pledge of Membership Interests dated as of June 17, 2007 (the "**Pledge Agreement**", and together with the Mezzanine Loan Agreement, the Mezzanine Loan Note, and the Mezzanine Mortgage, collectively, the "**Junior Loan Documents**"). As a condition to USB's agreement to modify the terms of the Mezzanine Loan under the Mezzanine Loan Agreement, the Pledgors agreed to acknowledge and reaffirm each of their obligations under the Pledge Agreement through a Reaffirmation Agreement with USB dated May 11, 2010.

38.     As a condition to the making of the Senior Loan and the Mezzanine Loan, US Bank and USB entered into a Subordination and Recognition Agreement dated as of June 11, 2007 that, among other things, subordinated the Mezzanine Loan to the Senior Loan and

provided that USB cannot receive any payment of principal under the Junior Loan Documents until the Senior Loan is paid in full.

39.     Under the Payment Guaranty, the Guarantors have guaranteed certain obligations of Waterscape with respect to the Mezzanine Loan

40.     As of the Petition Date, the Debtor's outstanding principal indebtedness under the Mezzanine Loan Agreement amounted to approximately $8,000,000.

### *Notices of Default*

41.     By letter dated January 14, 2011, US Bank notified Waterscape that it was in default of its obligations with respect to both the Construction Loan and Acquisition Loan. As a result of the outstanding and continuing defaults, beginning as of the date of the said notice of default, each of the Construction Loan and Acquisition Loan began to bear interest at the applicable default rate. Waterscape failed to remit payment to US Bank of the overdue amounts within the time frame set forth in the notice of default and consequently received a notice of acceleration from US Bank on March 4, 2011 advising Waterscape that the Construction Loan Note and Acquisition Loan Note, all interest on Construction Loan Note and Acquisition Loan Note, and all other amounts payable with respect to the Construction Loan and Acquisition Loan were thereby accelerated and declared to be due and payable.

42.     On February 22, 2011, USB sent a Notice of Default and Acceleration (the "**Mezzanine Default Notice**") to Waterscape advising Waterscape that it was in default of its obligations under the Junior Loan Documents and notifying Waterscape that all principal and other amounts due and owing on the Mezzanine Loan began to bear interest at the applicable default rate as of the date of the notice. The Mezzanine Default Notice further provided that unless all of Waterscape's defaults were cured on or before February 28, 2011, USB may enforce

it rights to, *inter alia*, accelerate the amounts due under the Mezzanine Loan Note and prosecute a foreclosure action for the sale of the collateral securing the Mezzanine Loan.

## II.    **RELIEF SOUGHT IN THE DEBTOR'S FIRST DAY PLEADINGS**

43.     The Debtor is filing contemporaneously with the filing of its Petition, or expects to file within a few days thereafter, various First Day Pleadings essential to the administration of the Chapter 11 Case. The First Day Pleadings include:

(a)     A motion for entry of a Case Conference Order as mandated by Local Rule 1007-2(e).

(b)     A motion for authority to use cash collateral of the Secured Lenders. Within two or three days after the Petition Date, the Debtor expects to be able to submit a proposed order with the consent of the Secured Lenders for use of cash collateral pursuant to an agreed budget, first on an interim basis and subsequently on a final basis. In the unexpected event that there are budget issues that cannot be resolved with the Secured Lenders, the Debtor may need to seek an order for the use of cash collateral without the Secured Lenders' consent.

(c)     A motion to establish bar dates for general unsecured claims and government claims. The Debtor expects to file a proposed plan of reorganization and disclosure statement within a week to ten (10) days after the Petition Date and seek approval of the disclosure statement and confirmation of the plan as quickly as possible. To facilitate the plan process and the administration of claims under the plan, the Debtor is requesting that bar dates be established at this early stage of the Chapter 11 Case.

(d)     A retention application for the Debtor's proposed general bankruptcy counsel and a motion to establish procedures for the payment of professional fees. In the next several days, the Debtor expects to file additional applications to retain as special counsel, or as ordinary course counsel, certain attorneys who have provided legal services to the Debtor prior to the Petition Date.

44.     As indicated above, the Debtor expects to be able to file a proposed Plan of Reorganization (the "Plan") and a proposed Disclosure Statement within a week to ten (10) days after the Petition Date, and contemporaneously to file a motion to schedule a combined hearing on the adequacy of the Disclosure Statement and confirmation of the Plan. As currently envisioned by the Debtor, the Hotel Sale Contract will be the principal source of funding for the

Plan. The Debtor's Secured Lenders, who will not receive the full amount of their secured claims under the Plan and will thus be deemed impaired, are expected to accept and support the Plan. The Plan will provide that the claims of all classes of creditors other than the Secured Lenders will be paid in full and are therefore not impaired. The Plan will further provide that the residual value of the Debtor's estate after the satisfaction of the Debtor's obligations to creditors under the Plan will be retained by the Debtor's current equity holders.

## III.     INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

45. Local Bankruptcy Rule 1007-2 requires certain information related to the Debtor, which I have provided in the exhibits attached hereto as **Exhibits A through F.** Specifically, these exhibits contain the following information with respect to the Debtor:[4]

- Pursuant to Local Bankruptcy Rule 1007-2(a)(4), **Exhibit A** hereto provides the following information with respect to each of the holders of the Debtor's 20 largest unsecured claims[5], excluding claims of insiders: the creditor's name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of person(s) familiar with the Debtor's account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(5), **Exhibit B** hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtor: the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

---

[4] The information contained in the Exhibits attached to this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtor. The Debtor reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

[5] As of the Petition Date, the Debtor had less than twenty (20) unsecured creditors. Accordingly, the attached list contains less than twenty (20) creditors.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the balance sheet annexed hereto as **Exhibit C** provides a summary of the Debtor's assets and liabilities. In addition, the principal assets and liabilities of the Debtor are described in detail in Part I of this declaration. The attached balance sheet is unaudited and subject to such adjustments and reconciliation as may hereafter be necessary.

- Local Bankruptcy Rule 1007-2(a)(7) is inapplicable to this Chapter 11 Case.

- Local Bankruptcy Rule 1007-2(a)(8) is inapplicable to this Chapter 11 Case.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(9), I hereby certify that the Debtor conducts its business at the hotel/residential condominium property owned by the Debtor at 66-70 West 45th Street, New York, New York. The Debtor maintains its corporate headquarters in space at 15 West 34th Street, 7th Floor, New York, New York 10001 which is subleased by the Debtor from a non-debtor affiliate, Denver West LLC. Under said sublease, the Debtor pays a monthly base rent of $60,000 to Denver West LLC for which, at no extra charge, the Debtor receives (in addition to the use of the subleased premises): (i) telephone, telefax and use of computer lines; (ii) all furniture, fixtures and equipment reasonably necessary for the Debtor to conduct its business; and (iii) basic office services such as reception and secretarial and accounting support.

- Local Bankruptcy Rule 1007-2(a)(10) is inapplicable to this Chapter 11 Case

- Pursuant to Local Bankruptcy Rule 1007-2(a)(11), I hereby certify that on March 21, 2011, Secured Lender UBS filed a foreclosure action against the Debtor in the Supreme Court of the State of New York, County of New York. The action is entitled <u>UBS Capital Resources,Inc. f/k/a USB Capital Funding Corp</u> v. <u>Waterscape Resort LLC</u>, et al., Index No. 11810101. To the Debtor's knowledge, although this action has been commenced, the Debtor has not been served with the summons and complaint in the action.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(12), **Exhibit D** hereto sets forth a list of the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief statement of their area of responsibility. In addition, Exhibit F reflects that the Debtor's estimated monthly cost for the services of senior management amounts to $129,766.66. As previously stated, the persons identified on Exhibit F are not employees of the Debtor. Rather, the Debtor contracts for management services with third party providers, and the personnel identified on Exhibit F are employees of those providers.

- Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), I hereby certify that the Debtor does not directly employ the persons who staff its business operations. As described in detail in Part I above, the Debtor contracts for staffing with various service providers. Nevertheless, the Debtor can estimate that its indirect cost of

labor for thirty (30) days will be approximately $198,635[6]. In that regard, annexed hereto as **Exhibit E** is a list of the personnel (not including corporate officers, directors or equityholders) that provide services to the Debtor's business and the details concerning the manner in which each employee is compensated. The Debtor does not intend to make any payments to corporate officers, directors or members during the first thirty (30) days after the Petition Date.

- Pursuant to Local Bankruptcy Rule 1007-2(b)(3), **Exhibit F** hereto provides a projected budget for the fourteen (14) weeks beginning March 28, 2011. The budget includes the 30-day period following the Petition Date in the four (4) weeks beginning April 4, 2011 and reflects an estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of this Chapter 11 Case, and any other information relevant to an understanding of the foregoing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 5, 2011                                    Respectfully submitted,

                                                        _/s/ Ezak Assa_____
                                                        Ezak Assa

                                                        Executive Vice President of Waterscape
                                                        Resort LLC

---

[6]   Exhibit E includes senior management personnel as well as staff employees. Subtracting the compensation of senior management (as reflected in Exhibit D) results in a total monthly cost of approximately $198,635 for personnel other than senior management.