UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:                                          :          Chapter 11
                                                :
WATERSCAPE RESORT, LLC,         :          Case No.: 11-11593 (SMB)
                                                :
                Debtor.                      :
--------------------------------------------------------X

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OVERRULING OBJECTION TO CLAIM FILED BY COUNCIL FOR ECONOMIC EDUCATION

**A P P E A R A N C E S:**

MEDINA LAW FIRM, LLC
The Chrysler Building
405 Lexington Avenue, Seventh Floor
New York, New York 10174

    Eric S. Medina, Esq.
        Of Counsel

    - and -

RICHARD J. MIGLIACCIO
410 Park Avenue, Suite 1630
New York, New York 10022

    Richard J. Migliaccio, Esq.
        Of Counsel

*Attorneys for Waterscape*

SHAPIRO, CROLAND, REISER, APFEL
    & DI IORIO, LLP
411 Hackensack Avenue
Hackensack, New Jersey 07601

    Alexander G. Benisatto, Esq.
    John P. Di Iorio, Esq.
        Of Counsel

*Attorneys for Council for Economic Education*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The Council for Economic Education ("CEE") filed proof of claim no. 22, dated May 24, 2011, in the sum of at least $235,313.28, and the debtor, Waterscape Resort, LLC ("Waterscape"), objected. The claim consists of unpaid rent and attorneys' fees and legal expenses due under a sublease between the parties, and the dispute turns mainly on when CEE vacated and delivered the subject premises to Waterscape. The relevant agreements being ambiguous, the Court conducted a two-day trial. The Court concludes that CEE delivered the premises to Waterscape on November 21, 2008, and had no obligation or responsibility for the Demolition Work discussed below.

## FACTS[1]

CEE is a New York-based not-for-profit corporation founded in 1949 that advocates for better and greater economic and personal finance education from kindergarten through high school. (*Declaration of Joseph A. Peri*, dated May 23, 2013 ("*Peri Declaration*"), ¶¶ 4-5 (ECF Doc. # 459); *Declaration of Nan J. Morrison*, dated May 20, 2013 ("*Morrison Declaration*"), ¶¶ 3-4 (ECF Doc. # 458).)[2] CEE occupied premises (hereinafter, the "Premises") in a building located at 1140 Sixth Avenue, New York, New York pursuant to a lease agreement (the "Lease") with RP Stellar 1140 Lessee LLC ("Stellar"), dated as of July 9, 1993. (CX 1.) The Lease was extended twice, and the last extension expired on July 31, 2010. (*Id.* at Bates no. RP 00053.) As used herein, "Lease" refers to the original Lease and the extensions.

---

[1]    The following conventions are used in this decision: "CX" refers to CEE's trial exhibits, "WX" refers to Waterscape's trial exhibits, "Tr. (6/10)" refers to the transcript of the first day of trial conducted on June 10, 2013 (ECF Doc. # 494), and "Tr. (10/17)" refers to the transcript of the second day of trial conducted on October 17, 2013. (ECF Doc. # 518). The relevant pages and lines are separated by a colon. For example, "Tr. (6/10) at 15:2-5" refers to page 15, lines 2 through 5 of the June 10, 2013 transcript.

[2]    Pursuant to the procedures established by the Court, witnesses gave their direct testimony by declaration, and submitted to cross-examination and redirect.

**A.    The Sublease**

During the summer of 2008, CEE was looking to sublet the Premises because it had entered into a lease for new space elsewhere. (Tr. (6/10) at 68:24-69:5.) During the same period, Waterscape was constructing a hotel/condominium project one block away from the Premises, and was looking for space to construct a model apartment and sales office in order to pre-sell apartments. (Tr. (6/10) at 76:24-77:13; Tr. (10/17) at 26:15-21.) The Premises fit Waterscape's needs. After the parties' brokers exchanged proposals (*see* WX DD, EE), they entered into a sublease dated August 2008 (the "Sublease"). (WX A at Bates no. RP 00094-108.) The Sublease included the following pertinent provisions:

> 1.    CEE was required to deliver the Premises to Waterscape on the Commencement Date "vacant, broom clean, and in its 'as is' condition." In addition, CEE was required to remove all of its furniture, furnishings and equipment from the Premises and deliver the Premises in "working order." CEE was not obligated to perform any work or furnish any materials in order to prepare the Premises for use and occupancy by Waterscape. (Sublease at ¶ 2.)
>
> 2.    The Commencement Date was the earlier of November 15, 2008 or thirty (30) days after CEE gave Waterscape notice that the Premises were ready for occupancy. If CEE failed to deliver the Premises by November 15, 2008, it agreed to pay Waterscape $2,000 per day after November 15, 2008 until it delivered possession of the Premises to Waterscape. (Sublease at ¶ 3.)
>
> 3.    Waterscape received a concession on its Fixed Rent obligation during the second month and the first fifteen days of the third month of the Sublease. The rent concession was subject to recapture and immediately due and payable in the event of a subsequent monetary default. (Sublease at ¶ 5(A).)

**B.    The Consent Agreement**

After CEE and Waterscape executed the Sublease, CEE sought Stellar's consent.[3] (Tr. (10/17) at 15:23-16:2.) Pursuant to an agreement dated November 18, 2008 signed by Stellar,

---

[3]    The Lease required CEE to obtain Stellar's consent to the Sublease. If CEE did not obtain Stellar's consent by September 30, 2008, either party could cancel or terminate the Sublease by written notice. (Sublease at ¶ 4.) Although CEE did not obtain Stellar's consent until November 18, 2008, neither party cancelled the Sublease.

3

Waterscape and CEE, (the "Consent Agreement" (WX A at Bates nos. RP 00087-92)), Stellar granted its consent.[4] The Consent Agreement also contained additional terms regarding construction work at or near the Premises. Stellar was then engaged in certain renovation work at the building (the "Renovation Work"), and needed access to the Premises to do some of that work. (Tr. (6/10) at 116:9-15.) And as noted, Waterscape intended to construct a sales office and model apartment, and its plans called for demolition work at the Premises (the "Demolition Work"). Paragraph 12 of the Consent Agreement dealt with both aspects of the contemplated work.

First, Stellar was granted permission to enter the Premises to perform the Renovation Work for fifteen business days (the "Renovation Work Period") commencing on the earlier of seven days after CEE gave Stellar written notice that it intended to vacate the Premises and November 21, 2008 (the "Vacate Date"). If CEE failed to leave by the Vacate Date, it was obligated to pay Stellar additional rent in the amount of $729.12 for each day after the Vacate Date that it remained in possession. (Consent Agreement at ¶ 12(a).) On the other hand, if Stellar could not complete the Renovation Work within the Renovation Work Period, it could extend the period for an additional seven days, and CEE was entitled to a credit against its Fixed Rent equal to $729.12 per day for each day that the period was extended. (*Id.* at ¶ 12(c).) The $729.12 corresponded to CEE's daily rent obligation for the Premises under the Lease.[5]

---

[4] The Consent Agreement was primarily negotiated between Stellar and Waterscape with minimal involvement by CEE. (*See Peri Declaration* at ¶ 14; (Tr. (6/10) at 41:4-23; Tr. (10/17) at 16:12-17, 56:10-16, 70:9-17.)

[5] Under the *Second Lease Modification and Additional Space Agreement,* dated Dec. 31, 2005, CEE was obligated to pay Fixed Rent in the sum of $21,873.52 per month for the Original Premises during the latter part of 2008 . (*Id.* at ¶ 5(a)(iv) (CX 1 at Bates no. RP 00057).) This translated to $729.12 per day based on a thirty day month.

4

Second, Stellar and Waterscape agreed that during the Renovation Work Period, Stellar would do the Demolition Work in accordance with the plans provided by Waterscape. Waterscape had the right, upon prior reasonable notice to Stellar, to enter the Premises to perform pre-construction work in order to prepare the Premises for occupancy and take measurements but could not perform any finish work or install furniture or equipment. (Consent Agreement at ¶ 12(b)(i)-(ii).) Waterscape agreed to pay Stellar $14,283.84 to perform the Demolition Work. (*Id.* at ¶ 12(d).)

Third, provided that Waterscape was not default under the Sublease and CEE was not in default under the Lease, CEE was entitled to a credit against Fixed Rent in the sum of $10,207.68, or fourteen days of Fixed Rent. (*See id.* at ¶ 12(b)(iii).)

The Consent Agreement was governed by New York law, (*id.* at ¶ 15), and in the event of any conflict between the provisions of the Consent Agreement and the Sublease, the provisions of the Consent Agreement would prevail. (*Id.* at ¶ 14.)

C.     **The Aftermath**

CEE vacated the Premises on November 21, 2008, and turned the space over the Stellar to perform the Renovation Work and the Demolition Work. (Tr. (6/10) at 93:17-20.) At the time of the turnover, the Premises were in an "as is" condition, vacant, free of furniture, furnishings and equipment, and broom clean. In addition, the utilities, heating and air conditioning systems worked. (*Peri Declaration* at ¶¶ 20, 23, 24; Tr. (6/10) at 63:3-64:1.) CEE credited Waterscape $12,000 on account of the six-day delay in vacating the Premises. (WX M, at WR 000049.) CEE also credited the amount of the rent concession, $28,708.64, and applied it to the rent due for January 2009 and part of February 2009. (*Id.* at Bates no. WR 000050.)

5

The Demolition Work began within one week after CEE vacated the Premises, (Tr. (6/10) at 132:1-5), and according to Waterscape, took longer than expected and encountered problems. As a consequence, Waterscape contends that the Demolition Work was not completed and it did not acquire possession of the Premises until December 2008 or January 2009. I assume this to be true for the purposes of this decision.

Waterscape stopped paying rent in May 2010,[6] and CEE sent a Notice of Default, dated May 26, 2010. (CX 4.) The Notice demanded the payment of rent in the amount of $21,850.51[7] as well as the forty-five day rent concession in the amount of $28,708.64 that was subject to recapture because of Waterscape's monetary default. Waterscape never responded to the Notice and also failed to pay the rent due for June and July 2010. (*Morrison Declaration* at ¶¶ 23-24.) In addition, the Sublease required Waterscape to pay a share of the real estate tax escalation. (Sublease at ¶ 5(B)(i).) CEE billed Waterscape $763.11 for its proportionate share of the real estate tax escalation on August 3, 2010. (*Morrison Declaration* at ¶ 25.) Based upon the evidence of damages submitted by CEE, it appears that Waterscape also defaulted on that debt. By letter dated September 8, 2010, CEE notified Waterscape that it was retaining its security deposit in the amount of $38,522.00 in partial satisfaction of the amounts that Waterscape owed CEE. (*Id.* at ¶ 27.)

---

[6] At some point, Waterscape attempted to justify its failure to pay rent by contending that CEE had failed to provide air conditioning. (*Morrison Declaration* at ¶¶ 33-34.) However, the Sublease provided that CEE was not required to provide air conditioning or any other services and would not be liable for any such failure unless it was due to CEE's default under the Lease. (Sublease at ¶ 11.) Furthermore, CEE was not required to take any steps to enforce its rights against Stellar, except that upon written request by Waterscape, CEE would demand that Stellar perform its obligations under the Lease. If this did not resolve the problem, Waterscape could bring an action in CEE's name, and CEE agreed to execute any documents reasonably required by Waterscape. (*Id.* at ¶ 12.)

[7] CEE is now claiming only the monthly Fixed Rent in the sum of $19,261.00.

**D.     Prior Proceedings**

After Waterscape objected to its claim, CEE filed a motion for summary judgment. The Court denied the motion from the bench. There were two principal issues that could not be resolved in the context of the motion. First, were the Premises in "working order" when they were turned over? Second, did Waterscape's obligation to pay rent under the Sublease (or the Consent Agreement) commence only after the Demolition Work was completed and Waterscape took occupancy of the Premises? (*See* Transcript of hearing held Mar. 5, 2013, at 47:4-16. (ECF Doc. # 456).) [8]

**DISCUSSION**

Waterscape maintains that it was not liable to pay rent under the Sublease until it obtained possession of the Premises following the completion of the Demolition Work. In addition, it maintains that "delivery" of the Premises did not occur until the completion of the Demolition Work, and CEE is also obligated to pay the daily $2,000.00 penalty until then, or $54,000.00. (*See Debtor's Proposed Findings of Fact in Connection with Evidentiary Proceedings Concerning Claim No. 22*, dated Oct. 31, 2013, at ¶ 25.) [9] CEE argues that the Demolition Work was an issue between Stellar and Waterscape, and Waterscape was required to pay rent to CEE, effective November 15, 2008, subject only to any rent credits provided under the Sublease.

"The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d

---

[8]     The Court also denied Waterscape's motion for permissive abstention. (*Memorandum Decision Denying Motion for Permissive Abstention*, dated Mar. 5, 2013 (ECF Doc. # 426).)

[9]     Waterscape's daily rent was $642.03 based on a thirty-day month.

7

166, 170 (N.Y. 2002). "A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." *Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011). If the contract is ambiguous, the court may resort to extrinsic evidence. In determining the meaning of an ambiguous provision, reasonable certainty rather than absolute certainty is the goal. *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087, 1102 (S.D.N.Y. 1989). The court should not add or excise terms, or "imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms." *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 961 (N.Y. 2001).

The Sublease required Waterscape to start paying rent on the Commencement Date, November 15, 2008. CEE delivered the Premises to Waterscape on November 21, 2008 by vacating the Premises and allowing Stellar, Waterscape's demolition contractor, to perform the Demolition Work, and gave Waterscape a $12,000 rent credit. At the time of delivery, the Premises were in an "as is," broom clean and vacant condition, free of furniture, furnishings and equipment.

They were also in "working order." "Working order" only meant that the lights, electricity and heating and air conditioning worked. (Tr. (10/17) at 22:2-9, 39:1-4.) The phrase did not mean, as Waterscape implies, that the Premises were not in "working order"— and CEE had to pay Waterscape $2,000.00 a day —until the Demolition Work was completed. CEE was aware that Waterscape intended to build a model apartment at the Premises, but the parties did not discuss it during the preparation of the Sublease, (Tr. (6/10) at 64:9-19), and the Sublease did not mention the Demolition Work. In addition, the very next sentence in the Sublease stated that

8

CEE was not obligated to perform any work or furnish any materials in order to prepare the Premises for use and occupancy by Waterscape.[10] (Sublease at ¶ 2.) Finally, Waterscape's own broker testified that the Sublease provided a forty-five day rent concession to accommodate any work that Waterscape had to do to prepare the Premises for its use. (Tr. (10/17) at 39:10-19.)

The Consent Agreement did not change the Commencement Date or modify Waterscape's obligation to pay rent. Notwithstanding the Sublease, CEE remained obligated to pay rent to Stellar under the Lease. The gist of the Consent Agreement, as between CEE and Stellar, was that Stellar had fifteen business days to complete the Renovation Work, and in exchange, CEE received a fourteen-day rent credit. If CEE vacated the Premises late, it had to pay Stellar $729.12 for every day it was late. On the other hand, if Stellar took longer than fifteen business days to complete the Renovation Work, it had to credit CEE $729.12 for every day that completion was delayed. Thus, the rent concessions and delay penalties were keyed to CEE's vacating the Premises and the Renovation Work.

The agreement regarding the Demolition Work, on the other hand, was solely between Waterscape and Stellar. The Consent Agreement did not mention or modify Waterscape's obligation to pay rent under the Sublease or condition it on the completion of the Demolition Work. Indeed, prior to execution of the Consent Agreement, Christine McGuinness, Esq., who was involved in all negotiations on behalf of CEE, did not have any discussions with Stellar or Waterscape to the effect that (i) CEE would be responsible for the Demolition Work, (ii) CEE

---

[10]  Waterscape has contended during these proceedings that CEE and Stellar were joint venturers, and CEE is therefore liable for the delays and related problems in the Demolition Work. The argument ignores the parties' agreements and is completely lacking in merit.

9

would bear the risk or liability for any delay, or (iii) Waterscape did not have to pay rent to CEE until Stellar completed the Demolition Work. (Tr. (10/17) at 18:16-20:2.)

The omission of any reference in the Consent Agreement to a rent concession is telling. The Consent Agreement was executed on November 18, 2008, three days after the Commencement Date under the Sublease and three days before CEE vacated the Premises. It was only after CEE vacated that the Renovation Work and the Demolition Work could begin. The Consent Agreement contained provisions that addressed CEE's rent obligations if the Renovation Work lasted longer than expected but said nothing about Waterscape's rent obligations. Waterscape obviously recognized that any construction would delay its occupancy. In fact, paragraph 12(b)(ii) of the Consent Agreement stated that Waterscape could enter the Premises only for limited purposes while Stellar was working there. Yet notwithstanding CEE's imminent departure and the inevitable delay that the Demolition Work would cause, the Consent Agreement did not include a rent concession on account of the Demolition Work. This strongly implies that no such agreement was reached.

Nor is it reasonable to infer a concession by CEE that Waterscape would not have to pay rent until the completion of the Demolition Work, or, as Waterscape argues, pay Waterscape $2,000 per day pursuant to the Sublease during the delay. CEE is a not-for-profit educational entity. It was looking to sublet the Premises, essentially for the remainder of the term, in order to move into new space. It remained liable for rent under the Lease, subject to the fourteen-day rent concession, for the remainder of the term. Furthermore, the Sublease had already granted Waterscape a forty-five day rent concession. In the absence of persuasive evidence to the

10

contrary,[11] it is unreasonable to conclude that CEE, a subtenant, implicitly assumed the risk of not receiving rent and paying $2,000 per day during an open-ended period of Demolition Work over which it had absolutely no control and even less interest.

Having concluded that Waterscape breached the Sublease, the Court can easily compute the majority of CEE's allowed claim. Waterscape failed to remit the May, June and July 2010 rent, aggregating $57,783.00, and its default triggered the recapture of the $28,708.64 rent concession. In addition, Waterscape failed to pay a real estate tax escalation in the sum of $763.11, for a total of $87,250.75. After applying the security deposit, Waterscape owes $48,728.75 exclusive of interest,[12] attorneys' fees and litigation expenses. (*Morrison Declaration* at ¶¶ 28-29.)

Waterscape contends that it was overcharged for electricity and is entitled to a credit. The monthly Fixed Rent under the Sublease included an Electrical Inclusion Amount of $1,699.50 per month. (Sublease at ¶ 5(B)(ii).) CEE nevertheless billed Waterscape $1,699.50 each month for electrical usage in addition to the Fixed Rent. Waterscape paid the full rent bill without deducting the $1,699.50 monthly overcharge for the ten month period commencing

---

[11] The only contrary evidence was the testimony from Waterscape's broker, Joshua Goldman, that he "thought" CEE's agent (CEE's broker Albert Duryea) had agreed that Waterscape would get "some daily rent credit for not getting possession." (Tr. (10/17) at 34:11-25; *see id.* 50:12-15.) Goldman eventually conceded that he did not discuss paragraph 12 of the Consent Agreement with Duryea, was not sure if Duryea or Stellar agreed to rent credit under the Sublease, (*Id.* at 42:22-43:13), and admitted that that he could not recall the details of a transaction that occurred five-and-one-half years before. (*Id.* at 50:25-51:23.) Duryea testified that although the concept of a rent concession was "clearly conveyed," the Demolition Work benefitted Waterscape, he never agreed that Waterscape would not have to pay rent during the Demolition Work, and there wouldn't be any reason to do so. (*Id.* at 57:2-17.) Accordingly, I do not credit Goldman's testimony.

[12] If the rent was not paid within ten days of the date it was due, Waterscape had to pay interest on the late rent at the annual rate which was the lower of 4% in excess of the prime or base business lending rate quoted by Citibank, N.A., or the maximum rate. (Sublease, at ¶ 5(B)(ii).) At all relevant times, the interest rate on unpaid rent was 7.25%, (*Morrison Declaration* at ¶ 31), but CEE did not provide evidence computing the amount of interest due as of the Petition Date.

December 2008 and ending September 2009.  (*Morrison Declaration* at ¶ 25 n. 2.)  In October 2009, Waterscape took a credit for the payment of the overcharges, deducting $16,995.00 from its October 2009 rent.  (*Morrison Declaration* at ¶ 25 n. 2 & Ex. F (p. 112 of 115).)  Although CEE continued to bill Waterscape each month for the Fixed Rent plus an additional $1,699.50, Waterscape deducted $1,699.50 and paid the balance (at least through April 2010).  (*Morrison Declaration* at ¶ 25 n. 2.)  CEE's claim seeks the Fixed Rent for May, June and July 2010, and does not seek any additional amount for electric usage.

The same issue was raised by Waterscape during CEE's motion for summary judgment. (*See Declaration of Nan J. Morrison in Support of Council for Economic Education's Motion for Summary Judgment with Respect to the Allowance of Its Claim*, dated Feb. 5, 2013, at ¶ 16 n. 2 & Ex. E (p. 110 of 116) (ECF Doc. # 410-4).)  Waterscape did not come forward with any evidence at that time to contradict Morrison's declaration testimony that Waterscape recouped the overcharge in October 2009.  Nor did it supply any contrary evidence at trial.  As a result, Waterscape is not entitled to a credit for electric overcharges.

The last component of CEE's claim is attorneys' fees and legal expenses.[13]  The Court decided to try the issue of attorneys' fees and legal expenses separately.  The parties are directed

---

[13] Paragraph 14A of the Sublease, entitled Indemnification, states in pertinent part:

> [Waterscape] shall indemnify and hold harmless the Indemnified Parties [Stellar and CEE] from and against any . . . damages, costs and expenses . . . for which the Indemnified Parties are not reimbursed by insurance, including . . reasonable attorneys' fees and expenses . . . incurred in connection with or arising out of the following to the extent not caused by the willful default or acts or omissions of the Indemnified Parties or matters occurring outside the Premises without the fault of [Waterscape]:
>
> . . . .
>
>  (ii) default by [Waterscape] in the payment of the Rental or any other default by [Waterscape] in the observance or performance of, or compliance with any of the terms, provisions or conditions

12

to contact chambers to schedule a conference at which to discuss the resolution of this issue, the computation of interest and any other remaining questions.

The foregoing constitutes the Court's findings of fact and conclusions of law. The Court has considered Waterscape's other arguments and concludes that they lack merit. So ordered.

Dated: New York, New York
November 21, 2013

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge

---

of this sublease including, without limitation, such matters relating to obtaining the possession of the Premises following any such default;

(iii) the exercise by [Waterscape] or any person claiming through or under [Waterscape] of any rights against [Stellar] granted to [Waterscape] hereunder.