UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re:                                                        :
                                                              :
WATERSCAPE RESORT LLC,                                        :     Chapter 11
                                                              :     Case No. 11-11593(SMB)
                              Debtor.                         :
----------------------------------------------------------------X

## MEMORANDUM DECISION GRANTING MOTION TO ENFORCE PLAN AND DIRECTING PAYMENT IN ACCORDANCE WITH DRB FINAL ACCOUNTING

**A P P E A R A N C E S:**

LAZARUS & LAZARUS, P.C.
*Attorneys for Reorganized Debtor*
240 Madison Avenue, 8th Floor
New York, NY 10016

       Harlan Mitchell Lazarus, Esq.
             Of Counsel

BARTON LLP
*Attorneys for Pavarini McGovern, LLC*
420 Lexington Avenue
New York, NY 10170

       Eric W. Sleeper, Esq.
             Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

       The plaintiff Pavarini McGovern, LLC ("Pavarini") was retained as general contractor by the debtor and defendant Waterscape Resort LLC ("Waterscape") to construct a building in Manhattan. Following the determination of its claim pursuant to a contractual alternative dispute resolution ("ADR") procedure, Pavarini moved to enforce the provisions of the *Second Amended Plan of Reorganization* ("*Plan*") and compel the payment of its claim. Waterscape opposed the motion, but for the reasons that follow, the motion is granted.

## BACKGROUND

The background to this bankruptcy case is discussed at length in *Pavarini McGovern, LLC v. Waterscape Resort LLC* (*In re Waterscape Resort LLC*), 483 B.R. 601 (Bankr. S.D.N.Y. 2012) (the "*Prior Decision*"). I assume familiarity with the *Prior Decision* and highlight the facts relevant to the current dispute.

Waterscape owns property located at 66-70 West 45th Street in Manhattan. On June 28, 2007, it entered into a Construction Management Agreement with Pavarini (the "CMA")[1] that designated Pavarini as the Construction Manager in connection with the project (the "Project") to build a 45-story hotel and condominium building on Waterscape's property. The CMA provided that Pavarini would receive progress payments through a requisition procedure based on the work performed by its subcontractors. If Waterscape disputed the work, it nonetheless had to pay the requisition and thereafter submit the dispute to the Dispute Resolution Board ("DRB"), the specialized ADR forum selected by the parties in the CMA:

> Costs for disputed Work shall be funded by [Waterscape] with the normal requisition process. Within 10 business days of the submission of a requisition [Waterscape] shall provide notice to [Pavarini] of any disputed portion of a requisition. [Waterscape] may submit the matter to the DRB for resolution. *However, the subject payment will not be delayed* and will be made 50% by the Owner as a Change Order and 50% from the Contingency pending resolution by the DRB. Once the DRB decision is made, the GMP or Contingency will be adjusted and or credited as appropriate.

(CMA Art. 19.5 (emphasis added).)

The "pay first" principle also applied to the DRB resolutions. The written resolution of the DRB was "binding upon the Parties for the duration of the Project through completion and

---

[1] The CMA is annexed as Exhibit 2 to the *Affidavit of William Frederick in Support of Pavarini McGovern, LLC's Motion for Partial Summary Judgment*, filed June 25, 2012 (Adv. Proc. 11-02248, ECF Doc. # 35).

Final Payment."[2] (CMA Art. 18.4.3; *accord* CMA Art. 18.5.3 ("The resolution of the DRB shall remain binding upon the Parties until contradicted by entry of judgment by a court of competent jurisdiction, or until otherwise agreed by the Parties in writing.").) Although the losing party had the right to challenge the DRB resolution through litigation, it had to pay the winning party first:

> No earlier than sixty (60) days after completion of the Project and Issuance of Final Payment, either Party may challenge the results of any DRB resolutions through litigation. The time for challenging the results of the DRB resolutions is meant to be a "cooling off" period subsequent to completion of resolutions by the DRB.

(CMA Art. 18.4.3; *accord* CMA Art. 18.5.3) ("No earlier than sixty (60) days after completion of the Project and issuance of final payment, either Party may appeal any resolution of the DRB by initiating litigation.")

Waterscape discharged Pavarini as Construction Manager and purported to terminate the CMA in September 2010 when the Project was nearly complete. The purported termination did not, however, affect the jurisdiction of the DRB which continued until Final Payment was made. (CMA Art. 18.1.7) ("[T]he DRB shall continue in existence for the duration of the construction of the Project and through final payment."); *accord Waterscape Resort, LLC v. Pavarini McGovern, LLC*, N.Y. Cty. Index No. 652035/10, bench decision at 3-5 (N.Y. Sup. Ct. Dec. 20, 2011) (concluding that Waterscape was required to submit claims to the DRB, and the DRB retained jurisdiction until final payment).[3]

---

[2]    "Final Payment" meant "the last payment to Construction Manager, including Retainage, in connection with the Project." (CMA, Ex. B at 80.)

[3]    A copy of the supreme court's bench decision is annexed as Exhibit 1 to the *Affidavit of Eric McGovern in Support of Motion to Enforce the Dispute Resolution Board's Final Decision and Direct Payment of Pavarini McGovern, LLC's Class 3 Claim*, dated Mar. 12, 2014 ("*McGovern Affidavit*") (ECF Doc. # 560).

### A. This Bankruptcy and the *Plan*

Waterscape commenced this chapter 11 case on April 5, 2011. On June 9, 2011, Pavarini filed a proof of secured claim in the amount of $10,833,132.59, plus interest, which corresponded to its filed mechanic's lien. This sum included the amounts that Pavarini owed to the subcontractors it had hired to do the work on the Project. Many of the subcontractors also filed their own mechanics' liens. As a result, approximately $20 million in mechanics' liens were filed against Waterscape's property although roughly half that amount, at most, was actually due.

Waterscape filed its initial plan in May 2011. (*See Debtor's Plan of Reorganization*, dated May 6, 2011 (the "*Original Plan*") (ECF Doc. # 43).) Waterscape proposed to sell the hotel portion of the Project for $126 million, and pay the net proceeds to its secured lender (the "Bank"). Pavarini objected, contending that the sale proceeds were trust funds under Article 3-A of the New York Lien Law, and Waterscape could not divert them by paying the Bank ahead of the trust beneficiaries, specifically Pavarini.

Pavarini also objected because the *Original Plan* required a "Final Order" prior to the allowance or payment of a Class 3 claim. As originally proposed, Final Order meant:

> an order, judgment, decree or decision of a court or other dispute resolution forum of competent jurisdiction which has not been reversed, stayed, modified or amended and as to which: (i) the time to appeal from, or to seek review or rehearing has expired, (ii) no appeal, review, certiorari or rehearing is pending, and (iii) the order, judgment, decree or decision has become conclusive of all matters adjudicated therein and is in full force and effect.

(*Original Plan*, § 1.4 at 5-6.) The definition suggested that there could be no Final Order while judicial review was pending, and Pavarini contended that it was entitled to payment under the CMA after the DRB ruled and before judicial review.

4

Waterscape eventually confirmed a different *Plan* on July 21, 2011 that resolved Pavarini's objections as well as other concerns. (*See Order Approving Disclosure Statement and Confirming Plan of Reorganization*, dated July 21, 2011 ("*Confirmation Order*") (ECF Doc. # 128).) First, the overlapping mechanics' lien/trust fund claimants (*i.e.*, Pavarini and the subcontractors) were placed in Class 3, (*Plan* at § 4.3), and the Bank and Waterscape agreed to carve out $11 million from the hotel sale proceeds to fund an $11 million Trust Fund Account to pay the Class 3 claims. (*Id.* at §§ 4.1(b), 5.3.) The $11 million contribution was arrived at by rounding up Pavarini's $10.8 million claim. The amount was considered sufficient to discharge all of the claims asserted by Pavarini and the subcontractors. Waterscape's counsel acted as the escrow agent for the Trust Fund Account. (*Id.* at § 5.3.)

Second, the *Plan* established a claims resolution procedure that was designed to by-pass the bankruptcy court although the Court also retained jurisdiction over the claims resolution process. Each Class 3 claim was deemed to be disputed, and Pavarini and the subcontractors would liquidate the allowed amount of their claims in non-bankruptcy *fora* as if the bankruptcy had never been filed. In Pavarini's case, this meant the DRB. The *Plan* provided, in pertinent part:

> Either prior to or following the Effective Date, the Allowed Amount, if any, of each alleged Class 3 Claim shall be determined by settlement or Final Order in the ordinary course in a court, the Court, *Dispute Resolution Board ("DRB")* or other dispute resolution forum of competent jurisdiction pursuant to the parties' contracts and applicable laws and procedures.

(*Id.* at 4.3(b) (emphasis added).) The Final Order (or settlement) rendered the disputed Class 3 claim an Allowed Claim, and the *Plan* required Waterscape to pay the full amount of the Allowed Claim within 60 days "from the Trust Fund Reserve Account described in section 5.3

5

hereof, the Secured Claim Reserve Account, new financing, and general funds of the Debtor." (*Id.* at § 4.3(d).)

Third, the definition of Final Order was modified at the Court's suggestion to add the following sentence: "'Final Order' with respect to Class 3 Claims shall be determined in accordance with the parties' existing contractual rights and state law." The modified definition was intended to preserve the position Pavarini took (and Waterscape opposed) regarding its right to payment under the CMA once the DRB ruled and prior to judicial review. In other words, the DRB final resolution constituted the Final Order that allowed the claim and required its payment under the *Plan*. In addition, § 4.3(b) was modified to expressly refer to the DRB.

**B.    The DRB's Final Accounting and Pavarini's Motion**

Between 2009 and 2013, the DRB rendered roughly 50 resolutions and supplemental resolutions and over 200 partial resolutions. (*McGovern Affidavit*, Ex. 2 at 1.) Some favored Pavarini while others favored Waterscape. In April 2013, Pavarini submitted a request for its overall monetary claim that required the DRB to take into account all of its prior resolutions. (*Id.* at 1-2.) On March 11, 2014, the DRB issued its 97-page Final Accounting in which it concluded that Waterscape owed Pavarini $8,093,655.92.[4] (Final Accounting at 97.) This sum consisted of $5,160,130.00 in principal and $2,933,516.92 in interest through March 11, 2014. The final number reflected over $3 million in settlements reached with subcontractors, (Final Accounting at 89), and absent these settlements, Waterscape would have owed that much more to Pavarini under the Final Accounting. Interest accrued on the principal balance at the annual

---

[4]    A copy of the Final Accounting is annexed as Exhibit 2 to the *McGovern Affidavit*.

6

rate of 15% or $2,120.61 per day, and Waterscape was directed to pay Pavarini within 30 days, or by April 10, 2014. (Final Accounting at 97.)

After the Final Accounting was rendered, Pavarini made the pending motion to enforce the DRB's Final Accounting and direct payment. Although Waterscape has characterized the motion as one seeking a mandatory injunction, Pavarini is only asking the Court to enforce the *Plan*. In essence, Pavarini argues that the Final Accounting is the Final Order allowing its disputed claim, and under the unambiguous terms of the *Plan*, Waterscape must now pay it. Furthermore, Waterscape cannot seek review of the DRB resolutions, including the Final Accounting, until 60 days *after* it pays.

In its opposition, Waterscape contends that Pavarini received Final Payment under the CMA when the $11 million Trust Fund Account was funded, and Waterscape is now free to challenge the DRB resolutions. (*Reorganized Debtor's Objection to the Motion by Pavarini McGovern, LLC to Enforce the Dispute Resolution Board's Final Decision and Direct Payment of Pavarini McGovern, LLC's Class 3 Claim*, dated Mar. 27, 2014 ("*Waterscape Objection*"), at ¶ 4 (ECF Doc. # 564).) Furthermore, Waterscape argues that Pavarini is judicially estopped from arguing that Waterscape did not make the Final Payment called for under the CMA because it repeatedly and successfully took the position that the money in the Trust Fund Account belonged to Pavarini and Waterscape had no interest in it. (*Id.* at ¶¶ 24-26, 30.) Finally, Waterscape maintains that under the *Prior Decision*, a claim had to be "finally resolved" before payment

from the Trust Fund Account and Pavarini's claim has not been finally resolved because it is subject to judicial review. (*Id.* at ¶¶ 13-14.) [5]

## DISCUSSION

This is a contract dispute. "A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." *Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011). Where a contract is unambiguous, extrinsic evidence concerning the parties' course of conduct is irrelevant. *TNT USA Inc. v. DHL Express (USA), Inc.*, No. 09–CV–0481 (JS) (ARL), 2012 WL 601452, at *6 (E.D.N.Y. Feb. 23, 2012); *Nat'l Abatement Corp. v. Nat'l Union Fire Ins. Co.*, 824 N.Y.S.2d 230, 232 (N.Y. App. Div. 2006); *239 East 79th Owners Corp. v. Lamb 79 & 2 Corp.*, 818 N.Y.S.2d 194, 195 (N.Y. App. Div. 2006).

Waterscape does not contend that the CMA is ambiguous on the issue raised by Pavarini's motion. The CMA plainly requires Waterscape to pay Pavarini the amount directed by the DRB before it can challenge the DRB decision. Instead, it mainly argues that the funding of the Trust Fund Account represented the Final Payment within the meaning of the CMA, and then contradicting itself, argues that it does not have to pay Pavarini until the DRB decision has been affirmed by a final order of a court of competent jurisdiction.

As discussed in the *Prior Decision*, Article 3-A of the New York Lien Law requires the owner hold all funds received in connection with the improvement of real property in trust and apply those funds to the costs of improvement. 483 B.R. at 610-11. The hotel sale proceeds that

---

[5] As noted, Waterscape also argued that Pavarini was seeking a mandatory injunction to which it was not entitled, but the argument mischaracterizes the relief that Pavarini is seeking.

the initial plan proposed to pay to the Bank were received at the closing in connection with the improvement of Waterscape's property, and Pavarini's and the subcontractors' unpaid claims represented costs of improvement. Accordingly, Waterscape was obligated upon receipt to hold the hotel sale proceeds in trust for the benefit of Pavarini and the subcontractors. Pavarini challenged the proposed payment to the Bank arguing that it amounted to a diversion under the Lien Law. The establishment of the Trust Fund Account resolved Pavarini's objection by requiring Waterscape to hold enough money in trust to pay the trust fund beneficiaries while allowing it to pay the balance of the proceeds to the Bank.

The funding of the Trust Fund Account did not, however, constitute payment to Pavarini under the *Plan*. "Payment" refers to the "[p]erformance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation." BLACK'S LAW DICTIONARY 1243 (9th ed. 2009); *accord* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (UNABRIDGED) 1659 (1981) ("the act of paying or giving compensation**:** the discharge of a debt or an obligation"). The funding of the Trust Fund Account may have discharged Waterscape's Lien Law obligation to hold the hotel sale proceeds in trust, but it did not discharge Waterscape's obligation to pay Pavarini its Allowed Claim. Instead, the *Plan* provided that all of the Class 3 claims were deemed disputed, and would not be paid until they were determined by a Final Order. Waterscape's argument that equates the funding of the Trust Fund Account with the payment of a claim ignores the terms of its own *Plan*.

Nor is Pavarini judicially estopped from arguing that the funding of the Trust Fund Account constituted the Final Payment under the CMA. "Judicial estoppel is designed to prevent a party who plays fast and loose with the courts from gaining [an] unfair advantage through the deliberate adoption of inconsistent positions in successive suits." *Wight v. BankAmerica Corp*,

9

11-11593-smb    Doc 569    Filed 04/09/14    Entered 04/09/14 16:10:05    Main Document
        Pg 10 of 14


219 F.3d 79, 89 (2d Cir. 2000); *accord Zedner v. United States*, 547 U.S. 489, 504 (2006); *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037 (2d Cir. 1993), *cert. denied*, 510 U.S. 992 (1993).  The doctrine is intended "to preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions," and "protect judicial integrity by avoiding the risk of inconsistent results in the two proceedings." *Bates*, 997 F.2d at 1037-38.

The application of judicial estoppel is discretionary, and three factors generally inform the Court's discretion.  First, the party's position must be "clearly inconsistent with its earlier position;" second, the party must have "succeeded in persuading a court to accept that party's earlier position;" and third, "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *New Hampshire v. Maine*, 532 U.S. at 750-51; *accord Zedner v. United States*, 547 U.S. at 504; *see Uzdavines v. Weeks Marine*, Inc., 418 F.3d 138, 148 (2d Cir. 2005).  The Second Circuit has taken a fairly narrow view of the doctrine, stating that judicial estoppel is limited "to situations where the risk of inconsistent results with its impact on judicial integrity is certain."  *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d at 148 (quoting *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir. 1997)).

The earlier proceedings on which Waterscape bases its judicial estoppel argument pertained to Waterscape's motion to move the Trust Fund Account to another bank.  After the Trust Fund Account was funded, Waterscape, the Bank, Pavarini, John Civetta & Sons, Inc. (a subcontractor), and Troutman Sanders, Waterscape's counsel, entered into an escrow agreement

(the "Escrow Agreement").[6] Troutman Sanders agreed to act as the escrow agent for the Trust Fund Account and maintain the escrow at either JP Morgan Chase Bank or Capital One Bank. (Escrow Agreement at ¶ 1.) The Escrow Agreement could only be modified in a writing signed by all of the parties. (*Id.* at ¶ 5(b).)

Several months later, Waterscape wanted to transfer the escrowed funds to another bank as part of an effort to cement a new banking relationship. (*See Escrow Motion* at ¶ 7.) Pavarini objected. (*See Objection of Pavarini McGovern, LLC to Debtor's Motion for Authority to Modify the Class 3 Creditors' Trust Fund Reserve Account Created Pursuant to the Debtor's Confirmed Plan and to Transfer Funds Therein to a New Depository Bank*, dated June 14, 2012 ("*Escrow Opposition*") (ECF Doc. # 363).) It argued that the escrowed funds were not Waterscape's to use for its personal benefit such as to enhance a banking relationship with a different bank. (*See id.* at ¶ 3.) Rather, the money belonged to the Class 3 claimants and Waterscape had no vested interest in the funds beyond the bare legal title held by a trustee. (*Id.* at ¶ 7.)

The Court denied the *Escrow Motion* from the bench on June 26, 2012. (*Order Denying Debtor's Motion for Authority to Change Depository Bank for the Trust Fund Reserve Account Created Pursuant to the Debtor's Confirmed Plan*, dated July 17, 2012 (ECF Doc. # 374).) Although no transcript is available, Waterscape's counsel stated in an email sent shortly after the hearing that the Court denied the motion because "the issue raised by the motion is governed by

---

[6]    A copy of the Escrow Agreement is annexed as Exhibit B to the *Debtor's Motion for Authority to Change Depository Bank for the Trust Fund Reserve Account Created Pursuant to the Debtor's Confirmed Plan*, dated Jan. 31, 2012 ("*Escrow Motion*") (ECF Doc. # 362).)

11

the parties' escrow agreement and not a matter for the Court's intervention." (*Email from Lee W. Stremba, Esq. to the Court*, dated July 17, 2012, 4:49 P.M. (ECF Doc. # 373).)

Judicial estoppel does not apply to Pavarini's current position for two reasons. First, the Court did not adopt the arguments asserted by Pavarini. Instead, it declined to intervene in an effort by one party to modify a contract over the objection of another party where the contract stated that it could only be modified in a writing signed by all of the parties. Second, the position that Pavarini now takes is not "clearly inconsistent" with the one it took in opposing the *Escrow Motion*. During the earlier proceedings, Pavarini argued that it was a beneficiary of the Trust Fund Account, and Waterscape held no more than bare legal title. Its position comported with well-settled law under Article 3-A of the Lien Law as well as trust law that the trustee has no property interest in the trust funds beyond bare legal title, and equitable title resides in the unpaid beneficiaries. *Prior Decision*, 483 B.R. at 611 ("The trustee holds bare legal title to the trust funds, and an equitable interest vests in the balance of the trust funds only after all trust claims have been satisfied."); *Coyne Elec. Contractors, Inc. v. United States* (*In re Coyne Elec. Contractors, Inc.*), 244 B.R. 245, 253 (Bankr. S.D.N.Y. 2000) (The money "owed JIB represents Lien Law trust funds, equitable ownership of those funds resides in JIB as a Lien Law beneficiary, and the debtor holds, at best, bare legal title."); *see* RESTATEMENT (THIRD) OF TRUSTS § 42, cmt. a (2003). Pavarini never argued during the *Escrow Motion* that the funding of the Trust Fund Account constituted payment to the trust fund beneficiaries.

Finally, Pavarini does not have to await judicial review of the Final Accounting before it can get paid. As Waterscape conceded at oral argument, Pavarini is entitled to payment now under the unambiguous terms of the CMA. Instead, it argues that Pavarini's right to payment

under the CMA was modified by the *Plan*.[7]  Quite the opposite, the modifications to the *Plan* were designed to preserve Pavarini's contractual right to payment in accordance with the terms of the CMA, not change them.  The CMA unambiguously requires Waterscape to pay Pavarini upon the conclusion of the DRB proceedings and prior to any judicial review.  The DRB's Final Accounting constitutes the Final Order under the *Plan* just as it would if no bankruptcy had ever been filed, and the Allowed Amount of Pavarini's Class 3 claim is the amount fixed by the DRB.  Furthermore, Waterscape cannot challenge the DRB resolutions until it pays Pavarini's allowed claim and waits 60 days.

Waterscape's dismay with the CMA's "pay first" principle is understandable.  It contends that the DRB got it wrong, (*Affirmation of Richard Migliaccio, Esq. in Objection to the Motion by Pavarini McGovern, LLC to Enforce the Dispute Resolution Board's Final Decision and Direct Payment of Pavarini McGovern, LLC's Class 3 Claim*, filed Mar. 27, 2014, Ex. 1 (ECF Doc. # 565), and fears that if it successfully challenges the DRB's resolutions, it will have to chase Pavarini for a refund of the Final Payment.  Nevertheless, this is the bargain the parties made, and the Court's duty is to enforce it according to its terms.

Accordingly, the Escrow Agent is directed to pay to Pavarini from the Trust Fund Account the sum of $8,093,655.92 plus interest at the annual rate of 15% on the principal balance of $5,160,130.00 accruing from March 11, 2014 to the date of payment.  If the Trust Fund Account does not have sufficient monies to satisfy Pavarini's allowed claim, Waterscape is

---

[7]    Waterscape also relied on language in the *Prior Decision* stating that a Class 3 claim would be paid when it was "finally resolved." (*Waterscape Opposition* at ¶ 13) (quoting *Prior Decision*, 483 B.R. at 608).  The language is taken out of context.  It was describing in general terms when Class 3 claims would be paid, and cited section 4.3(c) of the *Plan* which contains the Final Order requirement.  The phrase "finally resolved" was intended as a short hand reference to the requirement of a Final Order, and did not decide that Pavarini could not be paid until a court of competent jurisdiction determine the amount of its allowed claim.  That issue was not before the Court.

directed to pay the difference to Pavarini from "the Secured Claim Reserve Account, new financing, and general funds of the Debtor."  (*Plan* at § 4.3(c).)

Settle order on notice.

Dated: New York, New York
April 9, 2014

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge